IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PATRICIA WALKER,

      Plaintiff,

v.

CITY OF ATLANTA, ANDREW TADDEI,
Individually and in his
Official Capacity as an Atlanta
Police Officer, ADAM WRIGHT,
Individually and in his
Official Capacity as an Atlanta
Police Officer, COREY SAUBERAN,
Individually and in his
Official Capacity as an Atlanta
Police Officer, RICHARD
PENNINGTON, Individually and in
his Official Capacity as that
Atlanta Chief of Police, and
JOHN DOES 1-15, Individually
and in their Capacity as
Atlanta Police Officers,

      Defendants.

CIVIL ACTION NO.

1:11-cv-1167-JEC

## ORDER & OPINION

    This case is before the Court on defendants' Motion for Summary Judgment [26].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that the Motion for Summary Judgment [26] should be **GRANTED.**

## BACKGROUND

Plaintiff filed this action to recover damages related to the death of her son, Donald Hamilton. (Compl. [1] at 18-19.) Mr. Hamilton died after he was shot by Atlanta police officers during a confrontation with the police on May 4, 2008. (*Id.* at ¶¶ 12-32.) Plaintiff asserts claims against the City of Atlanta, all of the police officers involved, and the Chief of the Atlanta Police Department at the time of the incident. (*Id.* at 1-2.) The complaint includes federal claims arising under 42 U.S.C. § 1983 and the Fourth Amendment, in addition to several state law claims. (*Id.* at ¶¶ 33-61.)

The parties agree on the events leading up to Hamilton's shooting. On the night of the incident, Hamilton and a friend went to The Hole in the Wall, a club in Buckhead. (*Id.* at ¶ 16.) Hamilton got into a verbal altercation with a bathroom attendant and was escorted from the premises. (Compl. [1] at ¶¶ 17-18.) He then tried to reenter the club but was not allowed. (*Id.* at ¶¶ 19-20.) While waiting for his friends to exit the club, Hamilton began walking down the street. (*Id.* at ¶ 21.) Bystanders who saw Hamilton called 911 because he appeared to be drunk and he was openly carrying a gun. (*Id.* at ¶ 22.) Although he did not threaten to use the gun, Hamilton approached at least two people with the gun "basically pointed in the same direction as [them]." (Marr Statement [26] at

2

Ex. E.)

Five officers responded to the 911 call and found Hamilton still walking down Peachtree street.  (Defs.' Statement of Material Facts ("DSMF") [26] at ¶ 7.)  Four of the officers verbally ordered Hamilton to stop, show his hands and get on the ground.  (Taddei Decl. [26] at ¶ 4, Wright Decl. [26] at ¶ 4, White Statement [27] at 1, and Ervin Statement [27] at 1.)  The fifth officer, as well as all four of the civilian witnesses to the scene, confirmed that the other officers were shouting commands.  (Sauberan Decl. [26] at ¶ 4, Smith Statement [26] at 14, Terc Statement [26] at 16, Travis Statement [26] at 21, and Shaw Statement [26] at 24.)

At this point, defendants contend that Hamilton pointed his gun in the direction of Officer Taddei.  (DMSF [26] at ¶ 9.)  This assertion is supported by the declarations of the three officers who fired upon Hamilton as well as the civilian witnesses to the incident.[1]  (Taddei Decl. [26] at ¶ 5, Wright Decl. [26] at ¶ 6, Sauberan Decl. [26] at ¶ 6, Smith Statement [26] at 14, Terc Statement [26] at 16, and Shaw Statement [26] at 24.)  Defendants claim that three officers fired back in response to this threat.

---

[1]  Three of the four witnesses stated they saw Hamilton point his gun at the officers.  The fourth witness stated that, during the confrontation, he was looking at the police officers and not the suspect so he did not see what Mr. Hamilton was doing.  (Travis Statement [26] at 22.)

3

(DMSJ [26] at 3.)

Two of the responding officers, Officer Ervin and Officer White, did not fire their weapons during the altercation. Officer Ervin stated that he could never see the suspect's hands from his point of view. (Ervin Statement [27] at 1-2.) Officer White stated that at first she could not see the suspect's hands at all, but that she later noticed that "[the suspect] kept going in his pockets as if he were looking for something." (White Statement [27] at 1.) White claims that she followed Hamilton from behind and "saw him put a small black handgun to the right side of his head." (*Id.*) At that point, she yelled "drop the weapon!" at least three or four times to Mr. Hamilton, but he still failed to comply. (*Id.*) Officer White never fired her weapon "because [she] never saw [the suspect's] right arm change position due to the angle that [she was] at." (*Id.*)

Plaintiff argues that Officer White's testimony proves that Hamilton never pointed his gun at any civilians or officers. (Pl.'s Resp. to DMSJ ("Pl.'s Resp.") [27] at 2.) Plaintiff further contends, without any evidence or record citations except to the complaint, that after Hamilton was shot and lying on the ground, Officer Wright handcuffed him and shot him in the back of the head. (*Id.* at 3.) The medical examiner, who concluded that the cause of death was a gunshot wound to the head, could not determine the distance at which this shot was fired. (Rep. of Medical Examiner

4

[27] at 1.)  However, the examiner's report found an "absence of soot or strippling on the skin" by the head wound.  (*Id.*)

**DISCUSSION**

I.   **STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file and any affidavits, show "that there is no genuine [issue] as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant bears the initial burden of demonstrating that there are no issues of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  When evaluating whether this burden has been met, "the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918-19 (11th Cir. 1993).

Once the movant carries its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material fact[s]." *Scott v. Harris,* 550 U.S. 372, 380 (2007)(internal citations and quotations omitted) "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* In the qualified immunity context, the requirement that all evidence be viewed in the light most favorable to the nonmovant "usually means

5

adopting [] the plaintiff's version of the facts." *Id.* at 378. However, when a party's story is so blatantly contradicted by the record that no reasonable jury could believe it, the court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

## II.   **FACTUAL DISPUTES**

The only purported material factual disputes in this case concern (1) whether Hamilton pointed his gun at any of the officers before he was shot and (2) whether Officer Wright handcuffed Hamilton and then shot him in the back of the head as he lay on the ground. (Pl.'s Resp. [27] at 2-3, 9.)  In support of her claim that Hamilton did not point his gun at the officers, plaintiff cites the statements of Officers White and Ervin. (*Id.* at 2, 9.) However, Officer Ervin testified that "from [his] point of view [he] could not see [Hamilton's] hands." (Ervin Statement [27].)  In response to several clarifying questions, Ervin stated that he was 20-30 feet behind Hamilton, and could not see Hamilton's weapon at all. (*Id.*)  Officer White likewise emphasized that she did not see Hamilton point his gun at the other officers "due to the angle" she was at.  (White Statement [27].)  Neither White nor Ervin's statement, nor any other evidence in the record, contradicts the affirmative testimony of the other officers and the civilian witnesses that Hamilton pointed his gun directly at Officer Taddei just before he was shot.  (Wright

6

Statement [27], Sauberan Statement [27], Taddei Statement [27] and Witness Statements [26] at 14, 16 and 24.)

In support of her claim that Wright shot Hamilton after he was handcuffed, plaintiff cites an allegation in the complaint rather than any evidence or testimony in the record. (Pl.'s Resp. [27] at 3 and Pl.'s Statement of Material Facts ("PSMF") [27] at ¶ 13.) In fact, plaintiff's allegation conflicts with every witness statement in the record, even the statements that are otherwise relied upon by plaintiff. All of the witnesses attested that the only shots fired by the police were before the officers made physical contact with Hamilton. (*See* Witness Statements, attached to Def.'s Mot. [26] at Ex. E.)

Although the Court must view the evidence in the light most favorable to plaintiff, it need not adopt a version of the facts that no reasonable jury could believe. *Scott,* 550 U.S. at 380. Plaintiff's claim that Hamilton did not point his gun at the officers prior to his shooting, and her allegation that officer Wright shot Hamilton after he was handcuffed, are entirely unsupported by the record. As such, the Court does not assume these assertions to be true. *Id.* There are no other factual disputes that need to be resolved in order for the Court to properly rule on the motion for summary judgment.

7

III. <u>SECTION 1983 LIABILITY</u>

   A.   <u>City of Atlanta</u>

   A municipality is not liable under § 1983 for injury inflicted by its employees or agents under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978).  *See also Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1166-67 (11th Cir. 2013)(applying *Monell*).  Instead, the municipality is only liable under § 1983 when the execution of a governmental custom or policy inflicts the injury.  *Monell,* 436 U.S. at 694.  When the alleged injury is not directly attributable to the municipality, a plaintiff must demonstrate that the municipality, through its deliberate conduct, was the "moving force" behind the alleged injury.  *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). This burden is in accordance with the Supreme Court's directive that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Id.* at 405.

   In support of her claim against the City, plaintiff argues that the City's failure to properly train and discipline officers with regard to the use of excessive force constitutes "a policy that allows [its] officers to use excessive and deadly force without recourse."  (Pl.'s Resp. [27] at 6.)  A failure to train or discipline may in certain "limited circumstances" be the basis for

8

municipal liability under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). But the Supreme Court has emphasized that inadequate police discipline or training only supports § 1983 liability where the municipality's failure "amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Id.* at 388, 391 (adopting "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983"). The failure becomes "deliberate" when the need for better discipline or more training is so obvious and the inadequacy so likely to result in a constitutional violation that the municipality can be said to have been deliberately indifferent to the need. *Id.* at 390.

Plaintiff has not produced any evidence to support her claim that the City provides such inadequate training to its officers on the use of excessive force that it would likely lead to a constitutional violation. Further, the only evidence plaintiff submits to support her claim that the City had a policy of inadequate discipline concerning excessive force violations are the incomplete and nondescript discipline histories of Officers White, Sauberan and Taddei. Officer Taddei's disciplinary history lists no complaints for using excessive force or any similar violation. (Taddei OPS History [27].) Sauberan's disciplinary history lists no complaints for excessive force but does contain a single internal investigation

9

for the "Use of Force." (Sauberan OPS History [27] at 1.)  However, the history shows he was exonerated of the charge. (*Id.*)  Officer Wright's history lists two incidents where a citizen complained of "maltreatment or unnecessary force" in January, 2001 and in April, 2008. (Wright OPS History [27].)  The first complaint was not sustained and Wright was exonerated of the second complaint. (*Id.*)

The above evidence is insufficient to demonstrate deliberate indifference by the City in its discipline procedures concerning excessive force. *See Goodman v. Kimbrough,* 718 F.3d 1325, 1332 (11th Cir. 2013)("the deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence").  At most, the evidence shows that the City documented and investigated three complaints against the officers involved in this particular incident and found them lacking.  "Although all justifiable inferences are to be drawn in favor of the nonmoving party, inferences based upon speculation are not reasonable." *Kernal Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012).  Without more information regarding the cited incidents or any evidence concerning other incidents, a jury cannot reasonably infer that the City's discipline procedures rose to the level of deliberate indifference with respect to the use of excessive force by its police officers. *Id.  See also City of Canton*, 489 U.S. at 388.  Accordingly, the City is entitled to summary judgment on

10

plaintiff's § 1983 claims.[2]

**B.   Defendant Richard Pennington**

Defendants contend that summary judgment is warranted with respect to defendant Chief Richard Pennington in his individual capacity as well. (Defs.' Mot. [26] at 9.) Defendants point out that plaintiff does not allege that Chief Pennington was personally involved in Hamilton's shooting and that there is no potential causal connection between any action by Pennington and Hamilton's alleged constitutional deprivation. (*Id.*) Plaintiff does not address this argument or otherwise refer to defendant Pennington in her response.

Again, it is axiomatic that liability under § 1983 must be based on more than just a theory of *respondeat superior*. *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Thus, a supervisor is only liable under § 1983 for the actions of an employee when the supervisor personally participated in the alleged constitutional violation or when the plaintiff can establish a causal connection between the actions of the supervising official and the violation. *Id.* This causal connection may be established by showing a

---

[2]   To the extent the individual officers and the Chief of Police are sued in their official capacity, they are also entitled to summary judgment. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)(official capacity suits "generally represent only another way of pleading an action against an entity of which [the government] officer is an agent") and *Jones v. Rutherford*, 2013 WL 5273091 at *2 (11th Cir. 2013)("a suit against a public official in his official capacity is a suit against the local government he represents").

11

widespread history of the violation that would put the supervisor on notice of the need for corrective action. *Id.* *See also Bryant v. Jones*, 575 F.3d 1281, 1299-1300 (11th Cir. 2009)(discussing supervisory liability under § 1983). To support liability, the history of abuse must be "obvious, flagrant, rampant and of continued duration." *Brown,* 906 F.2d at 671.

As noted, plaintiff does not allege that Pennington participated in the use of excessive force against Hamilton. Plaintiff likewise fails to present evidence that widespread abuse was occurring at all, let alone that any such abuse was "obvious, flagrant, rampant and of continued duration." *Id.* The incomplete disciplinary histories cited above show three instances of excessive force complaints during the involved officers' cumulative thirty years of service.[3] Even assuming that each of these complaints constituted an "abuse" the complaints still only rise to the level of "isolated occurrences" regarding select officers rather than continued widespread abuse. *Id.* There is no evidence in the record to support Pennington's liability, other than the disciplinary histories. The Court thus finds that Pennington is entitled to summary judgment on plaintiff's § 1983 claim against him in his individual capacity.

---

[3]  According to their disciplinary histories, Wright was hired in 1997, Taddei in 2001 and Sauberan in 2007. (OPS Histories [27].) Their disciplinary reports were run in June 2012.

**C.    Defendants Taddei, Wright and Sauberan**

Defendants argue that the individual claims against Officers Taddei, Wright and Sauberan should be dismissed for two reasons. First, defendants contend that shooting Hamilton was not an excessive use of force under the circumstances. (Defs.' Mot. [26] at 9.) Second, defendants contend that the officers are entitled to the defense of qualified immunity. (*Id.* at 11.) Plaintiff disputes both of these contentions, based solely on the fact that two of the responding officers who were present during the incident, Officers White and Ervin, did not discharge their weapons. (Pl.'s Resp. [27] at 9.) According to plaintiff, Officer White and Officer Ervin's failure to shoot Hamilton raises a genuine issue of fact as to whether the named officers felt an immediate threat of danger that would justify the use of deadly force. (*Id.* at 12.) This argument is unpersuasive as to the asserted constitutional violation and inadequate to overcome qualified immunity.

1.    Defendants did not violate the Fourth Amendment.[4]

Plaintiff's excessive force claim is evaluated under the Fourth

_____

[4] This finding further supports summary judgment in favor of the City and Pennington. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(finding no potential for municipal liability where the plaintiff "has suffered no constitutional injury at the hands of the individual police officer").

13

Amendment's "objective[] reasonable[ness]" standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Under this standard, the legality of the force used is judged from the perspective of a reasonable officer under the facts and circumstances confronting the officer at the time, rather than with the benefit of hindsight. *Id.* at 396. In the deadly force context, the Eleventh Circuit has observed that a police officer may constitutionally use deadly force when the officer:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force [i]s necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013)(quoting *McCullough v. Antolini,* 559 F.3d 1201, 1206 (11th Cir. 2009)). In determining whether an officer used excessive force, the Court must be "mindful that officers make split-second decisions in tough and tense situations." *Id.*

Plaintiff argues that material issues of fact remain over whether defendants acted reasonably given that neither White nor Ervin, both of whom were at the scene, fired their weapons. (Pl.'s Resp. [27] at 9.) Plaintiff also cites Officer White's testimony that she only saw Hamilton point the gun at his own head and not at

14

the other officers. (*Id.*) Based on White's statement and the failure of White and Ervin to participate in the shooting, plaintiff infers that these two officers must not have perceived Hamilton to be a threat or that deadly force was necessary. (*Id.*) Plaintiff concludes that if White and Ervin did not fear for their safety, a genuine issue of material fact must exist as to whether the three officers named in this action did. (*Id.*)

As discussed above, there is no evidence to contradict the affirmative testimony of the civilian witnesses and three of the involved officers that Hamilton pointed his gun at Officer Taddei just before he was shot. The statements cited by plaintiff merely establish that Officer Ervin could not see Hamilton's hands or any weapon at all from his position 20-30 feet behind the suspect and that Officer White did not see Hamilton pointing his gun at Officer Taddei "due to the angle" that she was at. (Ervin Statement [27] and White Statement [27].) For the purpose of summary judgment, the Court assumes that Officers White and Ervin did not fear for their own safety. However, the fact that other officers did not shoot or did not fear for their own safety misses the point of the Fourth Amendment inquiry. The relevant inquiry is not whether every officer would react in exactly the same way in the given situation, but whether the accused officer's actions were objectively reasonable. *Penley v. Enslinger,* 605 F.3d 843, 852 (11th Cir. 2010). While the

15

former inquiry may be helpful in the evaluation of the latter, the fact that other officers would not or, as in this case, did not shoot is certainly not dispositive.  *Id.*

*Penley* is instructive.  In *Penley*, a 15-year old boy brought a fake gun, which officers believed to be real, to school and eventually the situation devolved into a standoff between the boy and police officers.  *Id.* at 846.  On the scene, there were at least two officers other than the named defendant who did not fire their weapons.  *Id.*  In fact, one of the officers, a hostage negotiator, testified that at no point in time did he feel like his life was in danger.  *Id.*  Despite the fact that neither of the other two officers fired their weapons and one even testified that he did not feel threatened, the Eleventh Circuit affirmed the lower court's decision that the force used by the defendant officer was objectively reasonable because the Court found the negotiator's feelings were not relevant to the proper inquiry under the Fourth Amendment.  *Penley,* 605 F.3d at 852.

Attempting to distinguish *Penley*, plaintiff claims that Officer Wright was standing in the same position as officers White and Ervin and thus, had the same view as them.  (Pl.'s Resp. [27] at 9.)  The *Penley* court noted that the officers who did not discharge their weapons were standing in a different place so their knowledge of the situation was not the same.  *Id.*  The evidence here suggests that

16

Officers Wright, White and Ervin were all standing behind and to the left of Hamilton. (*Id.*) However, it does not follow that all of the officers had the same viewpoint or knowledge of the situation. This fact is highlighted by the statements of White and Ervin, on which plaintiff relies. White stated that she saw Hamilton holding a gun and point it to his own head. (White Statement [27] at 1.) Ervin stated that he never saw the suspect's hands, let alone a gun in them during the entire altercation. (Ervin Statement [27] at 1-2.) It is thus clear that, as in *Penley*, the officers here all had different vantage points. Given these different viewpoints, the actions of Officers White and Ervin have little relevance to whether the other officers acted reasonably in shooting Hamilton.

Moreover, even were one to assume, contrary to the evidence, that the officers were mistaken in their belief that Hamilton was pointing a gun at Officer Taddei, the officers' actions were nontheless objectively reasonable under the Eleventh Circuit's Fourth Amendment jurisprudence. *See Garczynski v. Bradshaw,* 573 F.3d 1158, 1169 (11th Cir. 2009)("the fact that [the suspect] did not comply with the officers' repeated commands to drop his gun justified the use of deadly force under these particular circumstances."). In *Garczynski*, police surrounded a suspect who was in his car with a gun and threatening to kill himself. *Id.* at 1163. Believing that the suspect was going to try to drive away, the police decided to

17

approach the car. *Id.* An altercation ensued during which the officers claimed that the suspect pointed his gun at them, although the plaintiffs argued that the evidence did not support the officers' statements. *Id.* The Eleventh Circuit held that even if plaintiff's position was taken, the officer's actions were objectively reasonable. *Id.* at 1169. In so holding, the Circuit Court emphasized the fact that the suspect had ignored orders to drop his weapon. *Garczynski,* 573 F.3d at 1169. Under these circumstances, the Court stated, an officer need not wait until the armed man "has drawn a bead on the officer or others before using deadly force." *Id.* (quoting *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997)).

Plaintiff cannot persuasively argue that Hamilton posed any less serious of a threat to the safety of the officers and civilians around him than the suspect in *Garczynski*. The suspect in *Garczynski* "had not yet fired his gun and was not attempting to escape." *Id.* There were no civilians in the area. *Id.* at 1162-64. Nevertheless, the Eleventh Circuit found that the suspect's repeated refusal to obey commands to show his hands or drop his gun provided a sufficient basis for an officer to reasonably believe that the suspect posed an immediate risk of serious harm to them. *Id.* at 1169. Likewise, Hamilton's repeated refusal to drop his weapon gave the officers sufficient reason to believe that he was a threat to their immediate safety, as well as the safety of the several civilians nearby. In

18

essence, this was exactly the type of "tough and tense" situation contemplated by the Eleventh Circuit in *Morton,* 707 F.3d at 1281.

In short, it is undisputed that Hamilton repeatedly ignored several commands to show his hands, to get on the ground, and to drop his weapon. Uncontroverted evidence in the record further shows that Hamilton pointed his gun at or in the direction of one of the officers at some point during the confrontation. Given these circumstances, the defendants' belief that Hamilton posed a threat to themselves, their fellow officers, and the surrounding public was reasonable. As defendants did not use excessive force against Hamilton or otherwise violate his Fourth Amendment rights, they are entitled to summary judgment on plaintiff's § 1983 claims asserted against them in their individual capacities.

2.   <u>Defendants Are Entitled Qualified Immunity</u>.

Even were one to assume that the defendant officers violated the Fourth Amendment when they shot Hamilton, summary judgment is still warranted because the officers are entitled to qualified immunity for their conduct. Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). In order to prove that they are entitled to qualified immunity, defendants must first show that they were acting within the scope of their discretionary authority. *Leslie v. Hancock County Bd. of*

*Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013). If defendants establish that they were acting in their discretionary capacity, then the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Id*. In order to meet that burden, plaintiff must show that the actions of the government official violated a constitutional right and the right violated was "clearly established" at the time of the defendant's alleged misconduct. *Id*. *See also Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The parties agree that defendants were acting within their discretionary authority when Hamilton was shot. (Pl.'s Resp. [27] at 7.) Thus, in order to avoid summary judgment, plaintiff must show that the defendants' actions violated a constitutional right that was "clearly established" at the time of the incident. *Leslie,* 720 F.3d at 1345. The only constitutional violation plaintiff alleges is the use of excessive force in the apprehension of Hamilton. As previously reasoned, defendants did not use excessive force in violation of the Fourth Amendment when they shot and killed Hamilton. Thus, plaintiff fails to meet the first prong of the qualified immunity test.

"Because [the Court] conclude[s] that no constitutional violation occurred, [it] need not reach the second prong." *Garczynski*, 573 F.3d at 1166 (citing *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009)). However, even assuming a constitutional

20

violation occurred, plaintiff fails to meet the second requirement for defeating qualified immunity. That requirement is not met by pointing to cases that establish the general proposition that police may not use excessive force in apprehending a suspect, as plaintiff does here. *Brosseau v. Haugen,* 543 U.S. 194, 198-99 (2004)(quoting *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001)). Instead, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 199.

Plaintiff does not cite any cases that would provide the more "particularized" notice to or "fairly warn" defendants that their use of force against Hamilton would be excessive under the circumstances. *See Pace v. Capobianco*, 283 F.3d 1275, 1283 (11th Cir. 2002)("[b]ecause the preexisting law did not warn defendants fairly that shooting the decedent in these circumstances would clearly violate federal law, defendants [] are entitled to [qualified] immunity"). Indeed, an officer familiar with *Garczynski* or *Penley* would likely believe that his actions clearly would <u>not</u> violate a constitutional right. Qualified immunity thus clearly applies. For this additional reason, Officers Wright, Taddei and Sauberan are entitled to summary judgment in their individual capacities.

21

## IV.  **STATE LAW CLAIMS**

In addition to her § 1983 claims, plaintiff asserts a wide array of state law claims against the defendants: trespass, assault, battery, intentional infliction of emotional distress, negligence and claims under the Georgia RICO statute.  (Compl. [1].)  Because all the claims over which the Court had original jurisdiction now have been removed from the case due to the Court's decision to grant defendants' motion for summary judgment with respect to plaintiff's federal claim, § 1367(c)(3) applies.  This section provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

As the Supreme Court has observed, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  *Carnegie-Mellon Univ. v.*

22

*Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). *See also Hardy v. Birmingham Bd. Of Educ.*, 954 F.2d 1546, 1550 (11th Cir. 1992).

The Court concludes that dismissal is appropriate in this case because plaintiff's federal claims have been dismissed. Moreover, "[n]eedless decision of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Un. Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Accordingly, the Court **DISMISSES without prejudice** plaintiff's remaining state law claims.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** defendant's Motion for Summary Judgment [26] on plaintiff's § 1983 claims and **DISMISSES without prejudice** plaintiff's remaining state claims.


SO ORDERED, this 24th day of March, 2014.



/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

23